# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

GREGORY SLATE,

          Plaintiff,

          v.

AMERICAN BROADCASTING
COMPANIES, INC., *et al.*,

          Defendants.

Civil Action No. 09-1761 (BAH)

Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

The plaintiff Gregory Slate brings this copyright infringement action against the defendants ABC News, Inc., ABC News Interactive, Inc., and Disney/ABC International Television, Inc. (collectively, "ABC" or "ABC News"), seeking relief for what he claims was the willful and unauthorized use of less than one minute of video footage. The plaintiff filmed the footage at issue as a part of a hidden-camera investigation in Chicago in the fall of 2007 ("the Chicago footage")—a project that the plaintiff worked on with employees of the defendants and the Police Complaint Center ("the PCC"). The defendants had agreed with the PCC to produce the hidden-camera footage and believed that the plaintiff was an agent of the PCC. The plaintiff now claims that he owned the copyright to the Chicago footage all along, and he seeks to hold the defendants liable for direct and contributory copyright infringement because they have since used the footage in on-air broadcasts and distributed the same on the Internet and other media. The defendants have filed a motion for summary judgment on the merits of the plaintiff's claims and a motion to dismiss for bad-faith litigation conduct.[1]

---

[1] The plaintiff has requested a hearing on the pending motions. *See* Request for Hearing, ECF No. 101. The Court concludes in its discretion, however, that the issues have been amply briefed in both motions and that a hearing for oral argument is therefore unnecessary. *See* LCvR 7(f). As a result, the plaintiff's request for a hearing is denied.

## I.      BACKGROUND

Serious accusations about the handling of evidence have been lodged by each side against the other in this acrimonious litigation, and this has made more complicated—and more time consuming for the Court—the task of reciting the facts. For example, the plaintiff challenges the authenticity and validity of a number of pieces of evidence submitted by the defendants. *See, e.g.*, Pl.'s Statement of Genuine Issues in Dispute ("Pl.'s Facts") ¶¶ 4, 23–25, 27–28, 30, 44, 76–80, ECF No. 95-1. Meanwhile, the defendants accuse the plaintiff of fabricating evidence to manufacture a genuine dispute of material fact. *See generally* Mem. in Supp. of Defs.' Mot. to Dismiss for Bad-Faith Conduct of Litigation ("Defs.' Bad-Faith Mem."), ECF No. 94-1.

This is a dispute between Gregory Slate and ABC News, but a third party who plays a key role in this dispute is Diop Kamau. Kamau is a principal of the PCC, which has been a non-profit organization incorporated in Alabama since October 2002.[2] *See, e.g.*, Defs.' Statement of Material Facts Not in Genuine Dispute ("Defs.' Facts") ¶ 2, ECF No. 93-1; Reply Decl. of Nathan Siegel ("Fourth Siegel Decl.") (Oct. 17, 2011) Ex. SR-3, ECF No. 97-12.[3] One of the directors of the PCC, as listed on its Articles of Incorporation, is the plaintiff. *See* Fourth Siegel

---

[2] The Internal Revenue Service revoked the PCC's tax-exempt status in August 2010, after the commencement of this litigation. *See* Reply Decl. of Nathan Siegel ("Fourth Siegel Decl.") (Oct. 17, 2011) Ex. SR-1, ECF No. 97-2.

[3] The Local Rules of this Court require that, in the context of a motion for summary judgment, the movant must submit "a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement." *See* LCvR 7(h)(1). This same Local Rule requires an opposing party to submit "a separate concise statement of genuine issues . . . necessary to be litigated, which shall include references to the parts of the record relied on to support the statement." *Id.* Finally, this Local Rule states that "[i]n determining a motion for summary judgment, the court may assume the facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." *Id.* The Court interprets this rule strictly, such that if the movant asserts a fact, supported by record evidence, and the non-movant does not controvert that fact with its own supporting record evidence, the Court considers that fact to be admitted for purposes of the motion. *See, e.g.*, *Robertson v. Am. Airlines, Inc.*, 239 F. Supp. 2d 5, 7 (D.D.C. 2002) ("Because [LCvR 7(h)] helps the district court maintain docket control and decide motions for summary judgment efficiently, the D.C. Circuit has repeatedly upheld district court rulings that hold parties to strict compliance with this rule." (citing *Burke v. Gould*, 286 F.3d 513, 517 (D.C. Cir. 2002) and other cases)). Therefore, where the Court cites only the defendants' statement of facts, it is because the Court considers that fact conceded in light of the plaintiff's failure to controvert the fact with record evidence.

Decl. Ex. SR-3, at 3. As discussed below, Kamau and the plaintiff collaborated on at least two projects, both of which involved surreptitiously videotaping interactions with police officers and providing that footage to news organizations, which in turn used the footage to report on the officers' conduct. Less than a minute of such footage is the subject of the instant copyright infringement action.

### A. 2006 Cincinnati Project

In June 2006, ABC News, the PCC, and a local ABC affiliate in Cincinnati called WCPO "undertook to do a news investigation to test responses of local police precincts in the vicinity of Cincinnati to a person seeking to file a complaint." *See* Defs.' Facts ¶ 10. Working on this project were: the plaintiff, one other PCC "tester" named Edwin Pierre, an ABC News producer named Michael Mendelsohn, and a journalist from WCPO named Phil Drechsler. *See id.* ¶ 14; Decl. of Michael Mendelsohn ("Mendelsohn Decl.") ¶ 3, ECF No. 93-6; Decl. of Philip Drechsler ("Drechsler Decl.") ¶ 3, ECF No. 93-3. A producer from ABC News named Glenn Silber negotiated with Kamau regarding the terms of ABC's arrangement with the PCC. *See* Defs.' Facts ¶ 11. Under the terms of that agreement, ABC News paid the PCC a fee of $3,000 for its work, in addition to expenses such as airfare and hotel accommodations, and in return ABC News "owned any resulting video and was free to use it as it wished, including permitting any use by WCPO." *See* Decl. of Glenn Silber ("Silber Decl.") ¶ 4, ECF No. 93-5.[4] Ultimately, ABC paid the PCC the $3,000 fee and expenses totaling approximately $2,300, which is evidenced by two sworn declarations and documentary evidence. *See, e.g.*, *id.*; Decl. of Vivian

---

[4] The plaintiff states, in conclusory fashion, with respect to the 2006 Cincinnati project that "ABC does not own any footage shot by Slate and cannot permit any use of Slate's footage by WCPO." *See* Pl.'s Facts ¶ 12. This is a common theme throughout the plaintiff's statement of facts, but because the plaintiff's assertion in this regard is completely unsupported by citation to record evidence, the Court treats the defendant's supported factual assertions as conceded. *See supra* note 3. None of the footage filmed by the plaintiff in Cincinnati in 2006 is registered with the U.S. Copyright Office, and none of the footage from that project is at issue in this case.

Cappuccio ("Cappuccio Decl.") ¶¶ 2–3, ECF No. 93-17; *see also* Cappuccio Decl. Exs. C1–C2, ECF No. 93-18.

The plaintiff participated in this Cincinnati-based project as a "tester," which apparently involved surreptitiously recording interactions with police. According to Mendelsohn and Drechsler, the plaintiff at all times held himself out as an agent of the PCC. *See* Defs.' Facts ¶ 15; Drechsler Decl. ¶ 3; Mendelsohn Decl. ¶¶ 3, 11. The plaintiff, however, maintains that "[a]t all times in Cincinnati, [he] was working as an independent freelance journalist and expressly held [himself] out as such to Mendelsohn and Drechsler." *See* Decl. of Gregory Slate ("Slate Decl.") ¶ 32, ECF No. 95-2. WCPO ultimately aired a news report on July 9, 2006 based on the "testing" that the plaintiff conducted in the Cincinnati area. *See* Defs.' Facts ¶ 16. That story prominently featured the plaintiff, showing him being interviewed on camera in a number of different locations. *See* Drechsler Decl. Ex. 1, ECF No. 93-3(video of WCPO broadcast). The report also opened by introducing the plaintiff as "the director of the Police Complaint Center in Washington, D.C." *Id.* Drechsler says that the introduction was based upon "information that Mr. Slate provided to WCPO." *See* Drechsler Decl. ¶ 4.

In an e-mail dated August 2, 2006—about three weeks after the WCPO story aired—the plaintiff asked Mendelsohn "Did you get a chance to see the piece that WCPO did? It was pretty good." *See* Mendelsohn Decl. Ex. M6, ECF No. 93-7. The e-mail also stated "I mailed you the receipts from that trip. I wanted to make sure that you got them." *Id.* The plaintiff, however, maintains that he "never sent Mendelsohn receipts." *See* Slate Decl. ¶ 35. The plaintiff also maintains that he sent Mendelsohn a letter almost three weeks later on "August 21, 2006." *See id.* ¶ 36. The plaintiff has submitted what he avers is a copy of this letter, which states that he "was confused when WCOP [sic] proceeded to produce a story with [his] footage" because it

4

was his "understanding . . . that ABC and its affiliates were not interested in [his] footage and [he] accepted [Mendelsohn's] reimbursement proposal because [he] believed that [his] footage would retain its exclusivity and value." *See* Decl. of Chad R. Bowman ("First Bowman Decl.") (Mar. 9, 2011) Ex. 10, at 2, ECF No. 39-12. The letter goes on to "make a few things clear," including (1) "[a]lthough I know Mr. Kamau, I am not his employee and I have recently developed concerns about being publicly associated with him and his organization;" (2) "I am an independent freelance journalist" and so "ABC News and I should craft an explicit licensing agreement, ratified by both of us, before my footage is broadcasted;" and (3) "In terms of compensation, I do not work for free or for expenses only" because "my recent success, including receiving an Emmy Award for Investigative Journalism, have [sic] substantially elevated the value of my work." *See id.* at 2–3.

A substantial amount of evidence in the record undercuts the authenticity of this letter. The Court will only discuss the two most glaring examples.[5] First, Mendelsohn avers that he "never received the letter" and "saw it for the first time in 2010 after it was provided by Mr. Slate's counsel in this lawsuit." Mendelsohn Decl. ¶ 11. In fact, Mendelsohn avers that "Mr. Slate did not pitch stories to me, nor did he ever assert to me that he had any personal rights to, or expectation of payment for, any video filmed during the Cincinnati project or any other project." *Id.* Second, the sworn testimony of Rebekah Cowing, the Executive Director of the Chicago/Midwest Chapter of the National Academy of Television Arts and Sciences, Inc., sheds light on the "August 21, 2006" letter's conspicuous reference to the plaintiff "receiving an

---

[5] This letter was produced by the plaintiff's former counsel in discovery on May 27, 2010 as one of "a few new things that have popped up". *See* Decl. of Nathan Siegel ("First Siegel Decl.") (Feb. 17, 2011) Ex. 9, at 1, ECF No. 29-11. As discussed *infra*, the plaintiff's counsel filed a motion to withdraw as counsel on July 19, 2010—fewer than eight weeks after this letter was produced. *See infra* Part I.D. On August 17, 2010, the former presiding judge in this case held a status hearing to address the motion to withdraw, and in that hearing the presiding judge stated that he would recuse himself from the case and certify the case to another judge because he had "already learned information that probably a judge presiding over this case who has to continue to preside over it probably shouldn't know." *See* Tr. of Status Hearing at 5:17–20 (Aug. 27, 2010), ECF No. 99.

Emmy Award for Investigative Journalism." *See* First Bowman Decl. Ex. 10, at 3. The letter

references a local, Chicago-area Emmy award for a story aired by FOX's Milwaukee affiliate

WITI, *see* Dep. of Gregory Slate ("Slate Dep.") at 172:8–10, ECF No. 37-2, and the defendants

do not dispute that the plaintiff won that award. Cowing testified, however, that the nominees

for those awards were not announced until September 26, 2006—over a month after the plaintiff

purportedly sent the letter to Mendelsohn—and the winners were not announced until November

19, 2006—about three months after the purported date of the letter. *See* Dep. of Rebekah

Cowing ("Cowing Dep.") (June 6, 2011) at 15:7–15, 21:7–12, ECF No. 93-27. Furthermore,

when the nominees were announced on September 26, 2006, the plaintiff's name was not among

them because his name was not added to the WITI submission until December 11, 2006—nearly

four months after the letter was allegedly written and sent. *See id.* at 90:23–91:10; *see also* Decl.

of Nathan Siegel ("Third Siegel Decl.") (Sept. 1, 2011) Ex. S14, ECF No. 93-27 (December 11,

2006 e-mail from WITI reporter requesting to add the plaintiff's name "to the winning entry"

and referring to the plaintiff as a "co-founder of the 'Police Complaint Center' in Washington

DC").[6] The Court will return to these discrepancies when considering the defendants' motion to

dismiss.

    **B.**    **2007 Chicago Project**

    After the project in Cincinnati, Kamau wrote an e-mail to ABC News producer Glenn

Ruppel on April 3, 2007, proposing a new project. *See* Third Siegel Decl. Ex. S22, ECF No. 93-

28. In that e-mail, Kamau proposed "send[ing] in hidden cameras into bars frequented by

[Chicago] police officers to document excessive drinking and inappropriate behavior." *See id.* at

---

[6] Furthermore, for the nineteen months between the purported date of this letter and March 14, 2008, the plaintiff never again communicated to the defendants that he was an "independent freelance journalist," but rather made proposals to the defendants on behalf of the PCC. During that time, the plaintiff also never pursued an "explicit licensing agreement," let alone an agreement for "six figures" as this letter contends the plaintiff's "work is worth." *See* First Bowman Decl. Ex. 10.

1.  The e-mail further stated that "[o]f course we would supply the investigators if ABC can assist with the costs."  *Id.*  From the e-mail exchanges submitted, it is clear that Kamau and Ruppel contemplated a two-part process:  First, PCC and its testers would do an "advance scouting" trip in which they would "investigat[e]" at "a few locations where the likelihood of off-duty police presence is greatest."  *See* Decl. of Glenn Ruppel ("Ruppel Decl.") Ex. R2, at 2, ECF No. 93-9; Third Siegel Decl. Ex. S35, at 1–2, ECF No. 93-29.  If the scouting trip produced enough material "to commit to a full story," they would "proceed to the next stage," which would involve a larger-scale operation.  *See* Ruppel Decl. Exs. R2–R3, ECF No. 93-9.  Under the terms of this arrangement—negotiated through e-mail exchanges among Ruppel, Kamau, and the plaintiff—PCC was to be paid $2,000 for the first stage and $5,500 for the second stage, in addition to expenses.  *See, e.g.*, Third Siegel Decl. Ex. S35, at 1–2.  All of the plaintiff's e-mail communications regarding planning for the first Chicago trip were sent to and from the e-mail address "gslate@policeabuse.org," which was the domain name associated with the PCC.  *See, e.g.*, Third Siegel Decl. Ex. S35–S36, ECF No. 93-29; Ruppel Decl. Exs. R1–R5, ECF No. 93-9.  In fact, in one of these e-mails, the plaintiff's signature line reads:  "Gregory A. Slate, Director[,] The Police Complaint Center."  *See* Ruppel Decl. Ex. R1.

### 1.  *First Chicago Trip*

From approximately August 13 to August 22, 2007, the plaintiff and two other persons named Jack Baird and Mark O'Flahavan traveled to Chicago to carry out the first stage of the project.  *See id.* Ex. R3, at 1; *see also* Cappuccio Decl. Exs. C3–C4, ECF No. 93-18.  In connection with this first Chicago trip, ABC News pre-paid the travel expenses of the plaintiff and Baird, including airfare and hotel accommodations.  *See* Cappuccio Decl. ¶¶ 4–5.[7]  The

---

[7] Although ABC News has submitted credit card statements documenting these expenses, the plaintiff avers that "[w]hile [he] was in Chicago, [he] arranged for [his] own accommodations," *see* Slate Decl. ¶ 45, apparently in an

plaintiff also requested and received from ABC a "small [digital video or DV] cam[era]" for use in the testing project. *See* Ruppel Decl. Ex. R3, at 1; *id.* Ex. R4, at 1; *id.* Ex. R5, at 1. As a part of this project, Baird and O'Flahavan signed releases, granting the PCC the right "to use and reproduce [their] photographs and videos." *See* Third Siegel Decl. Exs. S134–S-135, ECF No. 93-37. These releases also stated that "[a]ll original images photographed for the [PCC] become the property of the [PCC]." *See id.* Filming on this first Chicago trip was done by Baird and O'Flahavan, in addition to the plaintiff, and the plaintiff can be seen on camera in many of the tapes filmed. *See* Defs.' Facts ¶ 36.

On August 14, 2007, both the plaintiff and Kamau first communicated with Ruppel via e-mail about the preliminary results of their scouting. The plaintiff conveyed to Ruppel that he had documented several Chicago police officers drinking heavily, many of whom arrived and left in official police vehicles. *See* Ruppel Decl. Ex. R6, at 2, ECF No. 93-9; Third Siegel Decl. Ex. S37, at 1, ECF No. 93-29. The plaintiff concluded that "[y]ou definitely need more people to do this right." Third Siegel Decl. Ex. S37, at 1. Kamau concurred, stating that, after "monitoring the bar checks with Greg over the last 24 hours . . . we should move on this now while things are going our way," and "[w]ith a full team I believe we can documents of [sic] extraordinary conduct." *Id.* Based on these strong early results, Ruppel agreed to let the plaintiff and his colleagues stay in Chicago for several more days, gathering more video of police officers drinking. *See* Defs.' Facts ¶ 32. Again, all of the plaintiff's e-mail communications during the first Chicago trip were sent to and from the "gslate@policeabuse.org" address. *See, e.g.*, Ruppel

---

effort to demonstrate his status as an independent contractor. Yet, the documentary evidence undercuts this assertion: In an e-mail to Ruppel in September 2007, the plaintiff complained about the hotel arrangements that ABC had made for the first Chicago trip, stating that "[l]ast time our hotel was near Midway and it ended up being far from most of the bars we ended up working in." *See* Ruppel Decl. Ex. R15, ECF No. 93-10. Indeed, the defendants' credit card statement shows that ABC paid for two rooms at the Fairfield Inn at Chicago Midway Airport—one from August 13, 2007 to August 21, 2007 and the other from August 15, 2007 to August 21, 2007. *See* Cappuccio Decl. Ex. C4, at 11.

Decl. Exs. R6–R11, ECF Nos. 93-9 to 93-10; Third Siegel Decl. Exs. S37–S38, S43, ECF Nos. 93-29 to 93-30.

Once the first leg of the Chicago project was completed, Kamau and Ruppel began discussing a larger return trip to Chicago in September 2007. *See, e.g.*, Third Siegel Decl. Exs. S48–S49, S52, ECF Nos. 93-30 to 93-31. Due to scheduling issues, however, the return trip was postponed until the second week of October 2007. *See, e.g., id.* Ex. S55, ECF No. 93-31; Ruppel Decl. Ex. R13, ECF No. 93-10. In preparation for the return trip, Kamau suggested to Ruppel in early September 2007 that the plaintiff travel to New York "to go over the video and create a comprehensive list of the police agencies, individual officers and drinking locations we have on tape." *See* Third Siegel Decl. Ex. S57, ECF No. 93-31. In arranging for the plaintiff's travel to New York, Ruppel asked whether he should contact the plaintiff directly, but Kamau replied "don't worry about that, when things get at this level everything goes through me." *See id.* Ex. S61, ECF No. 93-32. The plaintiff's trip to New York did not take place as originally planned, but instead took place in December 2007, as discussed below.

### 2. *Second Chicago Trip*

On September 24, 2007, the plaintiff notified Kamau that a police benefit event was being held in Chicago on September 28, which appeared to everyone involved to be a good opportunity to gather more film of police officers over-drinking. *See id.* Ex. S76, ECF No. 93-35. Ruppel approved of the plaintiff and a cameraman traveling to Chicago to capture film of the event, and he also approved of ABC covering travel and other "incidental costs" of the trip. *See id.* Ex. S81, ECF No. 93-35. While in Chicago, the plaintiff communicated with Ruppel via e-mail about the events that he and "our camera guy Moses" were attending, and also requesting additional camera equipment. *See* Ruppel Decl. Exs. R19–R23, ECF No. 93-10. After the

9

second Chicago trip, the plaintiff again reported back to Ruppel about the results, saying that "[i]t was very productive," and informing Ruppel that "[m]y expenses totaled approximately $600.00.  What is the best way for me to get that as soon as possible?"  *See id.* Ex. R23.

### 3. *Third Chicago Trip*

The third and final trip to Chicago took place between October 8 and October 14, 2007. *See* Defs.' Facts ¶ 49.  The plaintiff arrived several days before the ABC team, on October 8, and began scouting locations and filming police officers, some of which activity he communicated directly back to Ruppel via e-mail.  *See, e.g.*, Ruppel Decl. Exs. R27–R34, ECF No. 93-11.[8]  The other individuals who worked with the plaintiff during this third trip to Chicago included: (1) a videographer named Brianna Heard, who was a friend of the plaintiff's, *see* Dep. of Brianna Heard at 11:2–4, 11:20–12:7, ECF No. 93-26; (2) Sunny Antrim, who was an ABC employee, *see* Decl. of Sunny Antrim ("First Antrim Decl.") ¶ 1, ECF No. 93-14; (3) Sarra-Jane Piat-Kelly, a specialist in hidden-camera investigations whom ABC hired to consult on the trip and provide what are known as a "button camera" and two "purse cameras" for use on the project, *see* Defs.' Facts ¶ 53; and (4) a Chicago-based freelance camera crew, whom ABC also hired to participate in filming, *see* Ruppel Decl. ¶ 17, ECF No. 93-8.  Thus, during this third Chicago trip, at least six different individuals were filming events at any given time:  Slate, Heard, Antrim, Piat-Kelly, and two members of the freelance camera crew.  *See* Defs.' Facts ¶ 55; Ruppel Decl. ¶ 18.

The video collected by the plaintiff, O'Flahavan, Baird, and Heard was almost entirely of two varieties: (1) "MiniDV" cassette tapes; and (2) electronic digital files recorded onto a hard drive from what is known as a "pen camera" that the plaintiff had purchased between the August and September 2007 trips.  *See* Defs.' Facts ¶ 70.  The plaintiff claims that "[a]t all times [he]

---

[8] In one of these e-mails to Ruppel, the plaintiff once again inquired about ABC's reimbursement of his expenses, asking "Is there any [way] you can expedite getting me that money . . . ?"  *See* Ruppel Decl. Ex. R27.

filmed using cameras or DVRs he purchased," *see* Pl.'s Facts ¶ 70, but the plaintiff's own e-mail communications and video evidence indicate that he also used the "button camera" provided by ABC and Piat-Kelly, *see, e.g.*, Ruppel Decl. Ex. R39, ECF No. 93-11 (Slate e-mailing Ruppel "I stood in the middle of the street and aimed my *cams* at him . . . . If the *button* didn't get all this hopefully the pen cam did." (emphasis added)); Reply Decl. of Sunny Antrim ("Second Antrim Decl.") Ex. AR-5, at 5:48–6:00, ECF No. 97-26 (video of Slate using button camera).

### 4.   *Interactions with ABC After Completion of Chicago Filming*

After all the footage was shot in Chicago, the plaintiff physically turned over the original MiniDV tapes to ABC, and he transferred the digital files to ABC by uploading them to a hard drive provided by ABC and shipping the hard drive to New York  *See* Defs.' Facts ¶ 71; *see also* Ruppel Decl. Exs. R38–R40, ECF No. 93-11.  The plaintiff did not retain any copies of the MiniDV tapes, though it appears that the plaintiff did retain a copy of the digital files.  *See* Mem. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' SJ Mem.") at 20, ECF No. 93-2; *see also* Defs.' Facts ¶ 71; Pl.'s Facts ¶ 71.  Ruppel began reviewing the footage in October 2007 and corresponded extensively via e-mail with the plaintiff regarding the contents of the video.  *See* Defs.' Facts ¶ 73; *see also, e.g.*, Ruppel Decl. Exs. R38–R42, R45–R47, ECF No. 93-11.

In November 2007, Kamau e-mailed Ruppel and offered to send the plaintiff to New York to review the video, *see, e.g.*, Third Siegel Decl. Ex. S102, ECF No. 93-35, an offer which resulted in the plaintiff traveling to New York on December 4, 2007 to meet with Ruppel and review the Chicago footage, *see, e.g.*, Defs.' Facts ¶ 75.  The plaintiff claims that the purpose of this trip was "to meet with Ruppel . . . to discuss ABC licensing [his] footage," and, in this regard, that he "told Ruppel that if he wished to use any portion of [the plaintiff's] footage in any way he would need a written license agreement signed by [the plaintiff]."  *See* Slate Decl. ¶ 77.

Despite this claim, none of the e-mail communications between the plaintiff and Ruppel

regarding the New York trip make any reference to licensing film footage, let alone a licensing

agreement with the plaintiff.  *See, e.g.*, Ruppel Decl. Exs. R49–R50, ECF No. 93-11.

Additionally, shortly after filming in Chicago had ended, the plaintiff and Kamau

proposed a larger engagement with ABC News, which would expand the project to several other

cities, including Washington, D.C., Houston, and Miami.  *See, e.g.*, Ruppel Decl. Exs. R35, R-

43–44, R47–R48, ECF No. 93-11; Third Siegel Decl. Exs. S86–S89, S93, S95–S99, ECF No.

93-35.  After no ABC affiliates agreed to sign on to a larger hidden-camera investigation, the

plaintiff sent an e-mail to Ruppel on November 6, 2007, which stated:

> [Kamau] and I have discussed the reluctance of the affiliates to participate in this
> story. . . . *Our* motivation for working with 20/20 was to deliver a broad story that
> would address the issue on a national level by focusing on multiple cities.  Since
> none of your affiliates are willing to join you on this story and *we* clearly need
> more than *we* have now *this is what we propose*:  *We* will shoot in Washington,
> Baltimore and Philadelphia from now until mid-January.  *Our* fee will be
> $11,500.00 this will include the participation of me and at least two of our other
> under covers.  20/20 will be responsible for rental cars, gas, two roundtrip flights,
> hotels in Baltimore and Philadelphia and incidentals. . . . Let me know your
> thoughts.

Ruppel Decl. Ex. R48 (emphasis added).  Kamau had made a similar proposal to Ruppel

approximately one week earlier on October 31, 2007, which Kamau had asked Ruppel to forward

to ABC affiliates.  Kamua's proposal stated:

> The [PCC] will provide staffing and equipment to any affiliates interested in
> documenting off-duty inappropriate drinking by police officers. . . . Our services
> will include scouting locations for the story, shooting hidden camera video and
> providing consulting as needed for the stories['] successful completion.  Range
> $4500.00–11,500. . . . To have our staff shoot everything our $7,500 [sic] with
> *our primary investigator Greg Slate*.  If they want our female investigator and
> Greg the fee is $8,500.

Third Siegel Decl. Ex. S95.  Ultimately, no ABC affiliates signed on to Kamau's proposal, and ABC News declined the plaintiff's proposal for a multi-city project on November 6, 2007—the same day it was proposed.  *See* Ruppel Decl. ¶¶ 2, 24; Third Siegel Decl. Ex. S98.

### C.      Plaintiff and the PCC Part Ways and the Chicago Footage Airs on 20/20

On November 7, 2007, the day after ABC News declined the national project proposed by the plaintiff, the relationship between the plaintiff and the PCC began to unravel.  In an e-mail to Kamau, the plaintiff referenced text messages that he had received the night before "which told [him] there was a board meeting but not to worry [he's] not being fired."  *See* Third Siegel Decl. Ex. S100, ECF No. 93-35.  The plaintiff's response to Kamau was that "I find the proposition that anyone thinks that there is a case for firing me troubling and offensive.  I would not have delayed law school to work on this [driving under the influence] stuff if I knew that I would have anyone trying [to] leverage that sort of insecurity over my head."  *Id.*  On November 13, 2007, the plaintiff sent a lengthy e-mail to Kamau under the subject line "Resignation."  *See* Third Siegel Decl. Ex. S103, ECF No. 93-35.  In that e-mail, the plaintiff stated that "I do not believe I will be able to continue in any capacity at the [PCC] any longer."  *Id.*  After defending his work at length and taking issue with Kamau and his wife questioning his "motivations for contributing to the issue and the [PCC]," the plaintiff stated that "[m]y primary motivation for wanting credit for my work is to have something to point to when I apply to law school or otherwise try [to] advance myself. . . . I can't see any reason why I should stand idly by while the people at ABC take credit and pay for something that I worked very hard to produce."  *Id.*  The plaintiff went on to write that "[r]esigning from my position is the last thing I had planned to do, to exit out of business with a person whose friendship and experience have provided invaluable lessons to me in my life up until this point."  *Id.*  He stated that, although he had been prepared to

13

sign an employment contract "immediately," he "believe[d] the only reason we failed to sign a contract is your mistaken belief about my character," which the plaintiff said was "very disappoint[ing], given the tenure of our relationship." *Id.*

On December 7, 2007, the plaintiff sent an e-mail to Kamau, Kamau's wife, and an e-mail address entitled "boardofidirectors@policeabuse.org," in an apparent attempt to tie up some administrative loose ends with the PCC. *See* Third Siegel Decl. Ex. S164, ECF No. 93-38. Specifically, the e-mail sought to forward any of the plaintiff's personal correspondence from the PCC's P.O. Box in Washington, D.C. to an address in Baltimore. *See id.* The plaintiff also sought to get back "some of my personal copies of DVDs and a tape of projects I have worked on for the PCC so they . . . could [be] digitized . . . for the website." *Id.* On December 14, 2007, the plaintiff sent another in a series of long e-mail communications to Kamau, stating "[w]hat I want is simply a letter from the Board and you acknowledging that I have conducted myself with integrity, *been a good employee*, and have not done anything untoward, inappropriate or unethical." *See* Third Siegel Decl. Ex. S167, ECF No. 93-38 (emphasis added). Although the plaintiff had almost universally used his "gslate@policeabuse.org" e-mail address throughout his trips to Chicago in 2007, less than a month after his November 2007 resignation e-mail, the plaintiff stopped using that e-mail address when communicating with Ruppel. *See, e.g.*, Ruppel Decl. Exs. R51–R52, ECF No. 93-11. In January 2008, following the plaintiff's December 2007 meeting with Ruppel in New York, the plaintiff began separately communicating with Ruppel in an attempt to discredit Kamau. *See, e.g.*, Ruppel Decl. Ex. R61, ECF No. 93-12. There is no evidence in the record to suggest that, prior to January 2008, Ruppel or anyone else at ABC was aware that the plaintiff had "resigned" from the PCC in November 2007.

Throughout January and February 2008, the plaintiff and Ruppel traded e-mail communications about a number of smaller details relevant to the Chicago footage, such as the identities of the police officers being filmed and the dates of certain events. *See* Ruppel Decl. Exs. R62–R70, ECF No. 93-12. On March 3, 2008, the plaintiff registered certain portions of the Chicago footage as his own with the U.S. Copyright Office. *See* Defs.' Facts ¶ 87.[9] On March 14, 2008, the plaintiff wrote an e-mail to Ruppel, stating "[t]his letter is to withdraw any sort of license; either express or implied, to use any portion of my footage for any purpose. You are on notice not to use any of the footage I shot in Chicago and that any license has been revoked." *See* Ruppel Decl. Ex. R71, ECF No. 93-12. That same day, the plaintiff also sent an identical, certified letter to Ruppel with the subject line "Withdrawal of License." *See* Defs.' Facts ¶ 88. The plaintiff's letter and e-mail both stated "I have not received any consideration for my services," *see* Ruppel Decl. Ex. R71, but the very same day the plaintiff sent this letter and e-mail, he cashed a $1,487 expense check from the defendants, *see* Cappuccio Decl. Ex. C12, ECF No. 93-20.[10]

Despite the plaintiff's license revocation e-mail, ABC declined the plaintiff's demands and aired the broadcast containing the Chicago footage. *See* Defs.' Facts ¶¶ 90–91. The broadcast containing the plaintiff's allegedly copyrighted footage was a portion of the ABC show "20/20," an hour-long newsmagazine program consisting of three separate news reports, which aired on May 16, 2008. *See id.* ¶ 91. The video at issue in this case appeared during the second segment of the broadcast. *Id.* This segment lasted about fifteen minutes, but the portion

---

[9] The plaintiff registered a total of 14 videodiscs under three titles: (1) "Chicago Bar Surveillance and Hidden Camera Footage," (2) "Mike Mette Fundraiser Surveillance Footage," and (3) "UIC – Baseball Game, Bar Party and Road Footage." *See* U.S. Copyright Office, Public Catalog, *available at* http://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?DB=local&PAGE=First (under "Basic Search," search by "Name"; search "Slate, Gregory Allen"; select "Begin Search") (last visited April 23, 2013).

[10] The plaintiff points out that he "wrote the word[] 'Contested' on the back" of this check, *see* Pl.'s Facts ¶ 89, but the plaintiff does not dispute the fact that he cashed the check.

of the story involving the Chicago footage appears for two and a half minutes toward the end of the segment, *see id.*, and the footage that the plaintiff claims to be copyrighted consists of nine snippets of video totaling approximately forty seconds in length.[11]

### D.    Procedural History

The plaintiff filed his Complaint in the instant action on September 16, 2009, alleging one count of direct copyright infringement and one count of contributory copyright infringement. *See* Compl. ¶¶ 31–40, ECF No. 1.  On July 19, 2010, while this case was pending before a different judge of this Court, the plaintiff's lawyers moved to withdraw from the case "because continued representation under the circumstances has been rendered impossible."  *See* Mot. for Withdrawal of Appearance at 1, ECF No. 13.  Plaintiff's counsel stated that "[t]he necessity for the Firm's withdrawal under the circumstances has been confirmed by legal ethics counsel of the District of Columbia Bar and the Virginia State Bar," *id.*, though the precise reason for the withdrawal was never stated on the public record.  After a status conference was held on August 17, 2010, the motion to withdraw was granted, *see* Minute Order dated Aug. 19, 2010, and the plaintiff has proceeded *pro se* in this action ever since.  Following the withdrawal of plaintiff's counsel, the case was stayed for a period of time before it was reassigned to the current presiding judge on January 19, 2011.[12]  Currently pending before the Court are two motions filed by the defendants: a motion for summary judgment and a motion to dismiss for bad-faith conduct of litigation.  For the reasons discussed below, the Court grants the defendants' motion for summary judgment, and, as an alternative and independent basis for dismissing this case, the Court also grants the defendants' motion to dismiss for bad-faith conduct of litigation.

---

[11] There is a dispute between the parties as to the cumulative length of the allegedly copyrighted footage.  The time marks provided by the plaintiff total thirty-nine seconds, *see* Third Siegel Decl. Ex. S1, at 5–7, ECF No. 93-23, and the defendants estimate the total time as "about 30 seconds," *see* Defs.' SJ Mem. at 25.  The precise length of the footage broadcast, however, is not material to resolving the issues presented by the pending motions.

[12] The stay was lifted on January 3, 2011.  *See* Minute Order dated Aug. 19, 2010.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The burden is on the moving party to demonstrate that there is an "absence of a genuine issue of material fact" in dispute. *Id.* at 323.

In ruling on a motion for summary judgment, the Court must draw all justifiable inferences in favor of the nonmoving party and shall accept the nonmoving party's evidence as true. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3).  For a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* FED. R. CIV. P. 56(e).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor.  *See, e.g.*, FED. R. CIV. P. 56(c)(1).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted).

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. In that situation, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* Notably, "[s]elf-serving testimony does not create genuine issues of material fact, especially where that very testimony suggests that corroborating evidence should be readily available." *Fields v. Office of Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007). Additionally, "on summary judgment, statements that are impermissible hearsay or that are not based on personal knowledge are precluded from consideration by the Court." *Riggsbee v. Diversity Servs., Inc.*, 637 F. Supp. 2d 39, 46 (D.D.C. 2009); *accord* FED. R. CIV. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (holding that "[v]erdicts cannot rest on inadmissible evidence" and "sheer hearsay . . . therefore counts for nothing" at summary judgment).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury," however, "is as much art as science." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011). Particularly in a case such as this where the non-moving party relies almost entirely upon his own uncorroborated statements in depositions, declarations, and interrogatory responses to create a genuine issue of material fact, the Court must carefully assess whether the plaintiff's evidence is "merely colorable," *Liberty Lobby*, 477 U.S. at 249, or whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving

18

party," *id.* at 248. On the one hand, the Court must accept all of the non-movant's evidence as true and give him the benefit of all justifiable inferences. *See id.* at 255. On the other hand, a non-movant's allegations that are "generalized, conclusory and uncorroborated by any evidence other than the [non-movant's] own deposition testimony" are "insufficient to establish a triable issue of fact"—at least where the nature of the purported factual dispute reasonably suggests that corroborating evidence should be available. *See Akridge v. Gallaudet Univ.*, 729 F. Supp. 2d 172, 183 (D.D.C. 2010); *see also Gen. Elec. Co. v. Jackson*, 595 F. Supp. 2d 8, 36 (D.D.C. 2009) (observing that when a "declaration is self-serving and uncorroborated" it is "of little value at the summary judgment stage").

## III.     DISCUSSION

The defendants have moved for summary judgment on four independent bases. First, they contend that "Slate was in fact a voluntary PCC employee under the common-law agency test of *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989), so any footage he recorded was a 'work for hire' and Slate owns no copyright in it." *See* Defs.' SJ Mem. at 2 (emphasis omitted). Second, they argue that the plaintiff "held himself out as acting as a PCC principal who initiated and undertook this project on behalf of the PCC throughout the entire course of dealings between these parties," and thus "he is equitably estopped from now asserting infringement based on alleged personal ownership." *Id.* at 2–3. Third, the defendants argue that the plaintiff, through his "own words and deeds" impliedly granted the defendants a license to use the Chicago footage, which was supported by consideration and was thus irrevocable. *See id.* at 3. Finally, the defendants contend that, due to the plaintiff's bad-faith litigation conduct, his claims are "also properly dismissed as barred by the 'unclean hands' doctrine." *Id.*

The defendants also move for the dismissal of this action, pursuant to the Court's inherent powers, due to the plaintiff's alleged bad-faith litigation conduct. *See* Defs.' Bad-Faith Mem. at 1. In particular, the defendants charge that the plaintiff "has fabricated evidence; made numerous false statements under oath and to the Court; threatened and intimidated witnesses and abused process; attempted to fraudulently collect evidence; and generally abused the discovery process." *Id.* The Court will first address the defendants' arguments on the merits of the plaintiff's claims before discussing the considerations relating to the plaintiff's litigation conduct.

### A. Equitable Estoppel

The Court will first discuss the defendants' argument that they are entitled to summary judgment based on the equitable affirmative defense of estoppel. *See* Defs.' SJ Mem. at 31–35. "Estoppel is an equitable doctrine invoked to avoid injustice in particular cases." *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 59 (1984). "Equitable estoppel may deprive a plaintiff of an otherwise meritorious copyright infringement claim." *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 689 (4th Cir. 1992). The precise contours of the doctrine are not rigid, *see, e.g.*, *Heckler*, 467 U.S. at 59 (noting that "a hallmark of the doctrine is its flexible application"), but generally the doctrine has four conjunctive elements in the context of a copyright infringement action: "'(1) the plaintiff must know the facts of the defendant's infringing conduct; (2) the plaintiff must intend that its conduct shall be acted on or must so act that the defendant has a right to believe that it is so intended; (3) the defendant must be ignorant of the true facts; and (4) the defendant must rely on the plaintiff's conduct to its injury.'" *Tech 7 Sys., Inc. v. Vacation Acquisition, LLC*, 594 F. Supp. 2d 76, 86 (D.D.C. 2009) (quoting *Carson v. Dynegy, Inc.*, 344 F.3d 446, 453 (5th Cir. 2003)); *accord* 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON

COPYRIGHT § 13.07[A] (Matthew Bender, rev. ed. 2012). "The defense of estoppel is clearly available, if the plaintiff has . . . induced or caused the defendant to perform [the acts of alleged infringement]." 4 NIMMER ON COPYRIGHT § 13.07[A] (footnotes omitted). "Furthermore, it is accepted that estoppel may be accomplished by a plaintiff's silence and inaction." *Carson*, 344 F.3d at 453.

In this case, although the defendants' theory of estoppel is loosely related to their theory of work for hire, they contend that "the grounds for estoppel go beyond the specific question of Slate's employment status." Defs.' SJ Mem. at 33. The defendants argue that the record evidence demonstrates that "[g]oing back to 2006 the entire arrangement was consistently presented by both Slate and Kamau as one between ABC and the PCC, so ABC reasonably understood that it was entering into an agreement with that organization for its work product." *Id.* In light of these representations, and the defendants' reliance thereon, the defendants argue that the plaintiff is "estopped from asserting his own ownership of any footage for purposes of suing ABC for copyright infringement." *Id.* at 34. To summarize this argument, the defendants contend that the plaintiff (and Kamau) (1) led them reasonably to believe that they were purchasing work product from the PCC, and (2) the defendants detrimentally relied upon those representations by spending a significant amount of money to purchase the PCC's work product. *See id.* at 34. Hence, the argument goes, the plaintiff is equitably estopped from now claiming that the defendants were actually contracting for *the plaintiff's* personal work product. The plaintiff, however, contends that any theory of equitable estoppel must fail in the instant action because the defendants "have not demonstrated reliance on Slate's alleged conduct, that any such reliance on Slate's alleged conduct was reasonable, and that any such reliance engendered a

material change in position to their detriment." Pl.'s Opp'n to Mot. for Summ. J. ("Pl.'s SJ
Opp'n") at 26–27, ECF No. 95.

### 1. *The Reasoning of* **Boardman v. County of Spokane** *Is Persuasive.*

The defendants, in support of their equitable estoppel argument, rely heavily on an
unreported decision from the Ninth Circuit, which held that a plaintiff was estopped from
asserting copyright claims against a county government because he "actively misrepresented his
relationship" with a firm that the county was considering hiring to create a software program,
and "the County relied on [those] misrepresentations in agreeing to award [the company] the
contract." *See Boardman v. Cnty. of Spokane*, No. 94-35703, 1995 WL 444654, at \*3 (9th Cir.
July 26, 1995). The county "believed that it had hired a company with the necessary in-house
experience to efficiently and competently create and install the [software]," but "[i]n fact, it
appears that the County was actually dealing with a loose and transient affiliation of individuals
and companies." *Id.* Since the plaintiff had "participated in the misrepresentations made to the
County," the Ninth Circuit held that he was "estopped from disavowing [the misrepresentations]
now in order to assert independent copyright ownership against the County." *Id.* Although the
*Boardman* case has no formal precedential value because it was not a published decision, *see*
NINTH CIR. R. APP. P. 36-3, its reasoning, which was premised on closely analogous facts and
claims, is instructive to the Court in the instant action. The plaintiff attempts to distinguish
*Boardman* in two respects, neither of which is persuasive in light of the record evidence.

First, the plaintiff argues that the defendants in the instant action "did not rely on any
representation of an association between Plaintiff and the PCC in deciding to do business with
the Plaintiff or the PCC." Pl.'s SJ Opp'n. at 28. Rather, the plaintiff attempts to contrast the
facts in *Boardman*—where "Spokane County made a one-time decision to do a contracted piece

of work with a company they had presumably never worked with before"—with the instant action, in which the defendants "had done business with Kamau before" and decided "to do business with Plaintiff . . . entirely [due to] Plaintiff's previous work with other ABC 20/20 producers." *See id.* One initial observation about the plaintiff's argument is that it is internally inconsistent. On the one hand, the plaintiff concedes that ABC chose to do the Chicago project because they "had done business with Kamau before," but on the other hand he argues that the same choice to retain his services was not made in reliance on "any representation of an association between Plaintiff and the PCC." *Id.* Either the choice to work with the plaintiff was motivated by their prior dealings with the PCC, or it was not.

More importantly, in making this reliance argument, the plaintiff actually illuminates the primary way in which the instant action is an even clearer example of equitable estoppel than *Boardman*: The defendants' reliance on the plaintiff's (and Kamau's) representations about the plaintiff's agency and affiliation with the PCC was *all the more reasonable* because those representations extended over the course of not one, but two, projects. The fact that the plaintiff (1) held himself out as an agent of the PCC throughout the 2006 Cincinnati project[13] and, (2) in keeping with that holding out, never raised any issues regarding individual copyright ownership or licensing,[14] made it that much more reasonable for ABC to believe that the same arrangement was in place approximately one year later during the Chicago project. Indeed, the similarities between the material aspects of the 2006 Cincinnati project and the 2007 Chicago project are striking: a similar fee arrangement was charged for both; both involved multiple videographers provided by the PCC, including the plaintiff; both involved hidden-camera footage of

---

[13] *See, e.g.*, Drechsler Decl. ¶ 3; Mendelsohn Decl. ¶¶ 3, 11; Drechsler Decl. Ex. 1.

[14] The Court will address below the document that the plaintiff claims is an "August 21, 2006" letter, and which the plaintiff also claims raised the issues of individual copyright ownership and licensing. *See infra* Part III.B. It suffices to state here that the Court concludes that this document does not create a genuine dispute of material fact.

interactions with police officers; both involved travel and accommodations provided by ABC; and both were conducted for the clear purpose of producing a television news broadcast on ABC. *Compare supra* Part I.A, *with supra* Part I.B.1–3. In fact, after going back and forth via e-mail with Kamau and the plaintiff about "get[ting] something written up" regarding the Chicago project, Ruppel e-mailed the plaintiff and Kamau a few days later, saying "[i]t turns out there's a simple way to do this, since we've paid you before and all your info is in our vendor system." *See* Third Siegel Decl. Exs. S34–S35, ECF No. 93-29.[15] What is more, even after the Chicago project had finished filming, the plaintiff continued to propose a third project to ABC on behalf of the PCC, *see* Ruppel Decl. Ex. R48, which further solidifies the plaintiff's pattern of holding himself out to ABC as a PCC agent. As a leading copyright treatise observes, "a holding out sufficient to raise an estoppel may be accomplished by silence and inaction, *particularly if prolonged*." 4 NIMMER ON COPYRIGHT § 13.07[A] (emphasis added) (footnote omitted). Thus, the plaintiff's representations to ABC—both by affirmative statements and by silence in the face of Kamau's statements—militate in favor of, not against, applying the doctrine of estoppel in the instant case.

Second, the plaintiff attempts to distinguish *Boardman* on the ground that, in *Boardman*, "both parties agreed that a work-for-hire relationship existed between Plaintiff Boardman's employer and the County," while "there is no such relationship in this case." *See id.* at 29. The sole premise of this argument is that "[t]here was no licensing agreement between Defendants and the PCC." *See id.* The record is unclear in the instant action whether a formal, written

---

[15] This evidence, as well as the documentary evidence showing that (1) ABC paid the PCC, and not the plaintiff individually, for the 2006 Cincinnati project, *see, e.g.*, Cappuccio Decl. Ex. C2, and (2) the plaintiff was interviewed and appeared on camera during the Cincinnati project as "the director of the Police Complaint Center in Washington, D.C," Drechsler Decl. Ex. 1, demonstrates that the plaintiff's characterization of the Cincinnati project as his "personal work with Mendelsohn," Pl.'s SJ Opp'n at 29, is unsupported at best and borders upon affirmative misrepresentation.

licensing agreement existed between the PCC and ABC, but even assuming, *arguendo*, that there was no licensing agreement in the instant action between the PCC and ABC, that would not in any way diminish the persuasive force of *Boardman*'s reasoning. The reason *Boardman* is persuasive in the context of this case is that the plaintiff in *Boardman*, like the plaintiff in the instant case, consistently and repeatedly represented that he was an agent of an organization that was doing business with the defendant to create a copyrighted work. *See Boardman*, 1995 WL 444654, at *3. The *Boardman* court made clear that both the actual employment status of the plaintiff and the actual ownership of the copyrighted work were irrelevant to its holding, specifically noting that "[w]e do not . . . decide whether Boardman was or was not an employee and we do not decide who if anyone owns a valid copyright in [the software]." *See id.* at *4. The same is true in the instant case. The defendants make clear that "the grounds for estoppel go beyond the specific question of Slate's employment status," Defs.' SJ Mem. at 33, and thus necessarily the grounds for estoppel go beyond the application of the work-for-hire doctrine.

It is true that the application of equitable estoppel in the instant case is slightly distinct from the way in which other courts have often applied estoppel to copyright cases. *See, e.g.*, *Carson*, 344 F.3d at 453–55; *Rouse v. Walter & Assocs., L.L.C.*, 513 F. Supp. 2d 1041, 1068–69 (S.D. Iowa 2007). In those cases, the copyright claimant led a party to believe that the party had the right to use a copyrighted work by failing to assert his or her rights until after the party had already used the work. That particular scenario does not precisely apply here because the plaintiff did eventually assert his purported rights in the Chicago footage—albeit months after filming was complete, several weeks after the plaintiff had already turned over all of the footage to ABC's control, and long after ABC had already spent thousands of dollars producing the footage. *See* Ruppel Decl. Ex. R71. Nevertheless, the only way the instant case differs from

25

cases like *Carson* and its progeny is the nature of the defendants' detrimental reliance. In a typical case, detrimental reliance is the allegedly infringing use of the material itself, *see, e.g.*, *Carson*, 344 F.3d at 454–55, but the typical case also usually involves an employee making a claim of copyright infringement against a current or former employer, *see id.* at 455 n.9; *see also Le v. City of Wilmington*, 736 F. Supp. 2d 842, 844, 852 (D. Del. 2010); *DeCarlo v. Archie Comic Publ'ns, Inc.*, 127 F. Supp. 2d 497, 499–501, 509–11 (S.D.N.Y. 2001); *Quinn v. City of Detroit*, 23 F. Supp. 2d 741, 742, 753 (E.D. Mich. 1998). By contrast, the detrimental reliance in a case like the instant one, in which a defendant believes it is hiring an outside organization to create a copyrighted work, is the act of substantially compensating the organization in exchange for the work. Thus, in both types of cases the plaintiff is estopped from asserting an independent copyright due to an apparent disavowal of copyright ownership: In the typical case, that disavowal is evidenced by tacit permission to use the work, *see, e.g.*, *Quinn*, 23 F. Supp. 2d at 752 ("Quinn is estopped from pursuing his infringement action . . . because he gave the City permission to continue using [the work]."), while in *Boardman* and the instant action that disavowal is evidenced by a plaintiff cloaking himself in an agency relationship with the organization compensated to create the work, and thus apparently forfeiting any independent ownership of the work.[16]

## 2. *The Defendants' Reliance Was Both Reasonable and Detrimental.*

As to the plaintiff's arguments that the defendants' reliance was neither reasonable nor detrimental, neither argument can withstand the record evidence in this case, which is not genuinely disputed. "To show reasonable reliance, a party seeking estoppel must show that it

---

[16] This also goes to the plaintiff's argument that the defendants cannot invoke equitable estoppel because their "willful infringement" leaves them with "unclean hands." *See* Pl.'s SJ Opp'n at 24–26. To the extent that the defendants' hands are unclean, they have only become unclean because of the plaintiff's own representations. Thus, the plaintiff's attempt to invoke equity to deflect the import of the defendants' estoppel defense rings hollow.

'did not know nor should it have known that its adversary's conduct was misleading.'" *Genesis Health Ventures, Inc. v. Sebelius*, 798 F. Supp. 2d 170, 184 (D.D.C. 2011) (quoting *Heckler*, 467 U.S. at 59). Thus, the defendants' reliance in this case was only reasonable if they neither knew nor should have known, prior to being prejudiced as a result of their reliance, that the plaintiff considered himself to be independent of the PCC or that he had any other basis to assert an independent copyright on the Chicago footage. The reasonableness of the defendants' reliance in this case is most forcefully demonstrated by the sheer breadth and consistency of the plaintiff's representations of an agency relationship with the PCC, and the plaintiff's silence in the face of Kamau's similar representations, as the Court just discussed. *See supra* Part III.A.1. The evidence of these representations is not in genuine dispute, and thus they are sufficient to conclude that the defendants' reliance was reasonable.

The plaintiff attempts to manufacture a genuine factual dispute about the reasonableness of the defendants' reliance by making a number of assertions that have no support in the record. For example, the plaintiff asserts, without citation to any record evidence, that "Plaintiff pitched [the defendants] an idea for a story that Defendants deemed worthy of pursuit," that "plaintiff had done work with other news organizations which did not involve the PCC," and that "Defendants[] were repeatedly put on notice that they needed a licensing agreement from Plaintiff to use his work." *See* Pl.'s Opp'n at 29–30. These unsubstantiated allegations and assertions are simply insufficient to create a genuine dispute for trial. *See, e.g.*, *Liberty Lobby*, 477 U.S. at 252; *Veitch*, 471 F.3d at 134.

The only piece of evidence that the plaintiff cites in his briefing to support his argument that the defendants' reliance was unreasonable is a document that he says indicates that "Defendants did business with Plaintiff personally." *See* Pl.'s SJ Opp'n at 29 (citing Slate Decl.

27

Ex. 56). That document is an internal ABC document listing the "Contacts" for the Chicago

project, and it lists the plaintiff as "Undercover Investigator," and lists his cell phone number and

both his PCC e-mail address and his University of Maryland e-mail address. *See* Slate Decl. Ex.

56, ECF No. 95-16. The fact that the plaintiff was listed individually on a contact sheet,

however, would not permit a reasonable jury to conclude that ABC was unreasonable in relying

upon the representations that the plaintiff and Kamau made. Indeed, the plaintiff does not

explain why listing him individually indicates that ABC "did business with [him] personally."

*See* Pl.'s SJ Opp'n at 29. The fact that he was not specifically identified as a PCC agent on the

contact sheet is immaterial, particularly since his PCC e-mail address is listed—the same e-mail

address that the plaintiff consistently used to communicate with Ruppel throughout the Chicago

project. *See supra* Part I.B.[17]

Likewise, the plaintiff's contention that the defendants' reliance was not detrimental, *see*

Pl.'s SJ Opp'n at 30–31, is unavailing. In this regard, the plaintiff contends that "even had there

been earlier confusion . . . at the point at which Defendants cannot possibly deny knowing that

the copyright holder was and is [the plaintiff], they had not suffered any detriment from their

alleged reliance." *See id.* In this regard, the plaintiff argues that, at the time the plaintiff raised

the issue of his independent ownership of the Chicago footage, the defendants "had not yet

started editing any of Plaintiff's footage and it was months before the story had aired." *See id.* at

31. Hence, the plaintiff claims that "removing [his] footage from the episode would not have

been difficult, and . . . ABC could have and would have aired a story without Slate's footage."

---

[17] The e-mail address listed on the contact sheet ends in a ".com" domain rather than a ".org" domain. *See* Slate
Decl. Ex. 56. The only reasonable inference to draw from this is that the ".com" is a typographical error because
none of the parties have pointed to any evidence in the record that the e-mail address "gslate@policeabuse.com"
ever existed, and there is a copious amount of evidence that the plaintiff used the e-mail address
"gslate@policeabuse.org" when communicating with the defendants and their employees. *See, e.g.*, Third Siegel
Decl. Ex. S35–S38, S43; Ruppel Decl. Exs. R1–R11.

*Id.* This argument, however, is utterly immaterial to the issue of detrimental reliance. The detrimental nature of the defendants' reliance had manifested itself well before the plaintiff decided to speak up about his alleged independent ownership of the Chicago footage because the defendants had already "paid tens of thousands of dollars and dedicated substantial employee time and resources to help create and obtain [the] footage." *See* Reply Mem. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Reply") at 20, ECF No. 97. The plaintiff was clearly a beneficiary of at least some significant portion of that money, *see, e.g.*, Cappuccio Decl. ¶¶ 4–5, 8–9, 12–13, 15, and whether or not the PCC specifically paid him anything for the Chicago footage is immaterial to whether the defendants' reliance was detrimental.

Since there are no genuine disputes of material fact about (1) the representations that were made to the defendants regarding the plaintiff's affiliation and agency with the PCC, (2) the reasonableness of the defendants' reliance on those representations, or (3) the detrimental nature of the defendants' reliance, the Court concludes that the defendant is entitled to judgment as a matter of law on the plaintiff's claims on the basis of equitable estoppel. In light of this conclusion, the Court need not address the defendants' other proffered bases for granting summary judgment.

### B. The Plaintiff's Bad-Faith Conduct

Although granting summary judgment to the defendants is a sufficient basis to dismiss this case in its entirety, the Court also finds that there is a second, independent basis for dismissal of this case that must be addressed. As referenced above, both sides of this litigation have accused the other of engaging in bad-faith or inequitable conduct. *See supra* Part I; *see also, e.g.*, Pl.'s Facts ¶ 25; Pl.'s SJ Opp'n at 24–26. *See generally* Defs.' Bad-Faith Mem. Before discussing the defendants' arguments against the plaintiff, the Court will briefly address the

plaintiff's arguments in this regard, which focus primarily on the authenticity and validity of the documentary evidence presented by the defendants. Most notably, the plaintiff contests numerous e-mails submitted by the defendants on the grounds that they were sent or received from an e-mail address "created and used by Diop Kamau." *See* Pl.'s Facts ¶¶ 4, 23–25, 27–28, 41, 43, 48, 62–63, 65–66, 68, 74, 76. The apparent basis for this contention is that Kamau impersonated the plaintiff via the "gslate@policeabuse.org" e-mail address, and therefore that "where he does not clearly remember sending a given email, he does not feel like he can conclude that the email was necessarily sent by him." *See* Pl.'s Opp'n to Dismissal for Bad-Faith Conduct of Litigation ("Pl.'s Bad-Faith Opp'n") at 7, ECF No. 96; *see also id.* at 6 (contending that "all of these e-mails were under the control of Diop Kamau"). The Court need not entertain this claim other than to observe that the plaintiff does not deny that he sent any of the specific e-mails bearing the plaintiff's PCC e-mail address that were submitted by the defendants in support of summary judgment, and there is no evidentiary basis to conclude that any of those specific e-mails are not authentic.[18] Therefore, the Court concludes that all of the e-mail evidence submitted by the defendants is appropriate for consideration on summary

---

[18] The plaintiff has submitted a sworn declaration from an individual named Dorian Gibson, who avers that "[d]uring 2007, I saw Kamau send, receive, and delete emails using accounts that bore Greg Slate's name, including gslate @policeabuse.org." *See* Decl. of Dorian Gibson ¶ 38, ECF No. 95-18. The vague nature of this statement, however, is insufficient to raise a genuine factual issue about the authenticity of any of the *specific* e-mails submitted in the instant action. Mr. Gibson does not state whether any of the conduct that he purportedly witnessed related to the same (or even similar) e-mails submitted in evidence in the instant case. At best, Mr. Gibson's declaration could be considered *some* evidence supporting the notion that *some* e-mails *may* be inauthentic, but this is certainly not clear and convincing proof of their inauthenticity. *See Shepherd v. Am. Broad. Cos.*, 62 F.3d 1469, 1478 (D.C. Cir. 1995).

The plaintiff also erroneously asserts that a number of e-mails "clearly indicate they were sent in 2010, well after the commencement of this litigation, and do not even purport to have been sent by me." *See, e.g.*, Pl.'s Facts ¶ 24; *see also id.* ¶¶ 30, 44, 47–48, 76. The plaintiff is mistaken because, although all of the cited e-mails indicate they were sent in 2010, that is because they are clearly e-mails *forwarding* the text of the e-mails from the relevant time period. *See, e.g.*, Third Siegel Decl. Ex. S76. Thus, the plaintiff fails in attempting to characterize the text of these e-mails as irrelevant or inauthentic. These forwarded e-mails are the only e-mails that the plaintiff specifically denies sending, though he does not deny sending the original e-mails being forwarded. *See* Pl.'s Facts ¶ 44.

judgment.  *See, e.g.*, *Gleklen*, 199 F.3d at 1369 (holding that "[v]erdicts cannot rest on inadmissible evidence").

The same, however, cannot be said of all of the plaintiff's proffered evidence.  As discussed above, one piece of evidence submitted by the plaintiff warrants particular scrutiny.  *See supra* Part I.A (discussing First Bowman Decl. Ex. 10).  This "August 21, 2006" letter, which conveniently raises a number of the key legal issues presented in this litigation—such as the plaintiff's independence from the PCC and his expectation of being compensated independently for his work—also contains information that presents clear and convincing evidence that it is not authentic and has been presented to this Court in bad faith.  *See, e.g.*, *Shepherd v. Am. Broad. Cos.*, 62 F.3d 1469, 1478 (D.C. Cir. 1995) ("[F]or those inherent power sanctions that are fundamentally penal . . . the district court must find clear and convincing evidence of the predicate misconduct.").[19]  In particular, the letter contains an explicit reference to the plaintiff "receiving an Emmy Award for Investigative Journalism," *see* First Bowman Decl. Ex. 10, at 3, even though the referenced project which eventually was awarded the Emmy was not even nominated for that award until over a month after the letter was purportedly sent, *see* Cowing Dep. at 15:7–15, and the plaintiff's name was not added to the team eligible to receive the Emmy until December 11, 2006 (approximately four months after the letter was

---

[19] In considering a motion for sanctions, the Court must make both findings of fact and conclusions of law.  *See, e.g.*, *Confederate Mem'l Ass'n, Inc. v. Hines*, 995 F.2d 295, 301 (D.C. Cir. 1993) (observing that the trial court should have made "explicit findings of fact on either the exact basis underlying the sanctions or the reasonableness of the exact sanction chosen"); *see also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 401 (1990) ("Rather than mandating an inquiry into purely legal questions . . . Rule [11] requires a court to consider issues rooted in factual determinations.").  Indeed, in order to decide whether evidence of sanctionable conduct is "clear and convincing," *see Shepherd*, 62 F.3d at 1478, a court must necessarily weigh the evidence to determine whether it is "highly probable" or "reasonably certain" that a party has engaged in sanctionable conduct, *see Koszola v. FDIC*, 393 F.3d 1294, 1300 (D.C. Cir. 2005); BLACK'S LAW DICTIONARY 636 (9th ed. 2009).

purportedly sent), *see* Third Siegel Decl. Ex. S14.[20]  In response to this damning proof, the

plaintiff weakly asserts that his reference to the Emmy in the letter was "a bit of puffery," and he

erroneously asserts that "[a]t this point, Slate had become an Emmy Award Nominated

Journalist."  *See* Pl.'s Bad-Faith Opp'n at 3.  This glaring historical inconsistency cannot be

explained by "[t]he fact that Slate slightly overstated his credentials," as the plaintiff proposes.

*See id.*  Rather, even giving the plaintiff every reasonable inference, the letter's reference to the

plaintiff's receipt of the Emmy is clear and convincing proof that the letter was fabricated after

the fact, and the plaintiff has provided no explanation to rebut that conclusion.[21]

      The fabrication of this letter (and the plaintiff's subsequent attempts to defend its veracity

in signed pleadings to this Court)[22] is, at the very least, grounds to strike the document from the

summary judgment record, and it could very well also qualify as a basis, in and of itself, to

dismiss this case.  *See, e.g.*, *Jackson v. Murphy*, 468 F. App'x 616, 620 (7th Cir. 2012)

(affirming "sanction of dismissal" where party "both perjured himself and forged a document

critical to the prosecution of his case"); *Garcia v. Berkshire Life Ins. Co. of Am.*, 569 F.3d 1174,

1180 (10th Cir. 2009) (holding that "the severe sanction of dismissal [is] warranted" for "the

---

[20] Somewhat ironically, it was Kamau—the man whom the plaintiff was supposedly distancing himself from in the "August 21, 2006" letter—who lobbied to have the plaintiff's name added to the winning entry.  *See, e.g.*, Third Siegel Decl. Ex. S127, at 2, ECF No. 93-36.

[21] Additional indicia that the letter is a fabrication include:  (1) Mendelsohn, the alleged recipient of the letter, never received it, *see* Mendelsohn Decl. ¶ 11; (2) The plaintiff was unable to produce any electronic version of the letter, which would be subject to digital forensic analysis to shed light on its authenticity, but rather submitted what he says is a photocopy of the original letter.  The plaintiff states that "[t]he fact that Plaintiff was unable to locate an electronic copy of the letter should not be surprising, since, in the four intervening years between writing the letter and this litigation, Plaintiff has moved, gotten at least one new computer, [and] gained and lost email addresses," *see* Pl.'s Bad-Faith Opp'n at 2, but the plaintiff does not explain why he chose to retain only a physical copy of this letter despite the fact that he has apparently not kept only physical copies of any other material communications in this case; and (3) The letter says that the plaintiff "was confused when WCPO [sic] proceeded to produce a story with [his] footage," First Bowman Decl. Ex. 10, yet on August 2, 2006 (nearly three weeks before the letter was allegedly sent), the plaintiff e-mailed Mendelsohn and stated "Did you get a chance to see the piece that WCPO did? It was pretty good," *see* Mendelsohn Decl. Ex. M6.  These indicia contribute to the clear and convincing evidence of falsification and support the conclusion of falsification.

[22] The plaintiff also testified in his sworn deposition that he sent the "August 21, 2006" letter to Mendelsohn.  *See, e.g.*, Slate Dep. at 58:19–61:21, 103:22–104:21.  That testimony, for the reasons discussed above, was likely perjurious, or at the very least intentionally misleading.

submission of falsified evidence"); *Young v. Office of U.S. Senate Sergeant at Arms*, 217 F.R.D.

61, 70 (D.D.C. 2003) ("'[D]ismissal is the appropriate sanction where a party manufactures

evidence which purports to corroborate its substantive claims.'" (quoting *Vargas v. Peltz*, 901 F.

Supp. 2d 1572, 1580–81 (S.D. Fla. 1995))); *cf. Shepherd*, 62 F.3d at 1479 (holding that sanction

of dismissal is appropriate where a "destroyed document is dispositive of the case, so that an

issue-related sanction effectively disposes of the merits anyway"). The problem that arises when

a party submits falsified or fabricated evidence is that it "substantially prejudices an opposing

party by casting doubt on the veracity of all of the culpable party's submissions throughout

litigation." *Garcia*, 569 F.3d at 1180. "The prejudiced party is forced either to attempt

independent corroboration of each submission, at substantial expense of time and money, or to

accept the real possibility that those discovery documents submitted by the opposing party are

inaccurate." *Id.* The "August 21, 2006" letter is a good example.[23] To prove that the letter was

a forgery, the defendants were forced to incur the expense of deposing Ms. Cowing and locating

the other pieces of evidence that clearly demonstrate the letter's invalidity. *See* Defs.' Bad-Faith

Mem. at 38. The defendants have asked the Court to dismiss this action as a sanction for the

---

[23] The defendants also argue that a second piece of evidence submitted to the Court was fabricated. That second piece evidence is a set of handwritten notes that were purportedly written by the plaintiff in the summer of 2006. *See* Decl. of Nathan Siegel ("Second Siegel Decl.") (May 19, 2011) Exs. 49–50, ECF Nos. 66-51 to 66-52. The defendants contend that these handwritten notes are forgeries because they are written on stationary from FOX's St. Louis affiliate KTVI—a news station with which the plaintiff did a story that did not air until early 2007. *See* Defs.' Bad-Faith Mem. at 8–9. The plaintiff first attempted to explain this discrepancy by contending that he had already begun to work with KTVI in 2006. *See* Pl.'s Opp'n to Defs.' Mot. to Compel at 11, ECF No. 71 (asserting that "Plaintiff was in fact working for a Fox Television Station in 2006"). The time codes visible on the footage from the plaintiff's project with KTVI, however, clearly show that the footage was not shot until late January 2007— months after the handwritten notes were purportedly written. *See e.g.*, Defs.' Bad-Faith Mem. at 9 (showing screen shot from KTVI footage). Indeed, one of KTVI's investigative reporters confirmed in a sworn affidavit that the plaintiff did not first travel to KTVI to work on the project until January 2007. *See* Decl. of Chris Hayes ¶ 4, ECF No. 93-4. Perhaps realizing that his prior explanation had become untenable, the plaintiff then suddenly changed his story in opposing the defendants' motion to dismiss, contending for the first time that he had access to KTVI's stationary, not because of his prior work with KTVI, but because he "had worked with many people who had worked with that station in the past" and therefore some other, unnamed individual "use[d] it, [and] pass[ed] it around" to him in 2006. *See* Pl.'s Bad-Faith Opp'n at 4. The Court need not decide whether these handwritten notes are, in fact, fabrications, though clearly the circumstances surrounding their creation are suspicious to say the least.

plaintiff's bad-faith litigation conduct, *see id.* at 1, but before the Court assesses the appropriate

sanction for the plaintiff's conduct, a fuller explication of the plaintiff's litigation conduct is in

order.

To begin, the plaintiff has made numerous representations to the Court that are

diametrically at odds with the documentary evidence present in the record.  The Court has

already pointed out a number of examples of this behavior in its discussion up until this point,

such as the plaintiff's statement in his sworn affidavit that he "never sent Mendelsohn receipts,"

*see* Slate Decl. ¶ 35, despite his statement in a contemporaneous e-mail to Mendelsohn "I mailed

you the receipts from that trip.  I wanted to make sure that you got them," *see* Mendelsohn Decl.

Ex. M6.  Another of many examples is the plaintiff's sworn statement that "ABC did not supply

me with any camera equipment," *see* Slate Decl. ¶ 59, despite the fact that several e-mail

communications between the plaintiff and Ruppel document that the plaintiff requested and

received numerous pieces of camera equipment from ABC, *see, e.g.*, Ruppel Decl. Exs. R3–R5

(plaintiff asking for "covert cameras" and receiving "a small DV cam"); *id.* Exs. R15–R16

(plaintiff requesting "three hidden camera's [sic] and decks that will do ok in low light" and

receiving a button camera and two purse cameras); *id.* Exs. R24–26 (plaintiff and Ruppel

discussing further "camera option[s]", including a "[w]ater bottle camera" and plaintiff saying

"I'll take the water bottle"), and they even document the efforts that Ruppel engaged in to get to

the camera equipment back from the plaintiff after filming was complete, *see* Ruppel Decl. Ex.

R12.  Numerous other similar examples of demonstrable misstatements abound in the plaintiff's

sworn declaration, his deposition testimony, and in his signed submissions to the Court.  *See*

*generally* Defs.' Bad-Faith Mem. at 10–20 (citing other examples).  What is more, the Court

cannot attribute such misstatements to the plaintiff's innocent negligence or forgetfulness

because, in many instances, the plaintiff made his misrepresentations in an attempt to dispute the facts presented by the defendants, with full knowledge of the record evidence cited by the defendants to support their factual assertions. *See, e.g.*, Slate Decl. ¶¶ 35, 59 (directly responding to statements, supported by record evidence, in the defendants' statement of facts). These actions by the plaintiff are further clear and convincing evidence that he has conducted this litigation, at least in part, in bad faith.[24]

Furthermore, the plaintiff has engaged in a course of conduct, which demonstrates that he does not take seriously his obligation to litigate in good faith. Most notably, Mr. Slate has repeatedly attempted to abuse the discovery process, and his persistent course of conduct in this regard strongly suggests that he acted willfully. This conduct includes, but is not limited to: (1) attempting to fraudulently collect evidence;[25] (2) producing discovery documents in a soiled envelope that had the strong odor of excrement;[26] (3) improperly videotaping his own deposition testimony;[27] and (4) producing voluminous amounts of irrelevant and misleading materials.[28]

---

[24] The Court makes no credibility determinations in arriving at this conclusion. Rather, the Court concludes that the plaintiff has failed to communicate with the Court and with his adversaries with the candor that is expected of every litigant. This is not a matter of whether the plaintiff's statements are credible, but rather whether they are demonstrably false. Although this lack of candor would undoubtedly bear upon the plaintiff's credibility before a jury, that is not an aspect of the plaintiff's actions about which the Court draws any conclusions.

[25] The defendants have presented persuasive evidence that the plaintiff engaged in a scheme to manufacture and collect evidence under false pretenses. *See* Defs.' Bad-Faith Mem. at 20–23. Specifically, the plaintiff, through a third party e-mail address (using the name of the plaintiff's brother), made an inquiry to ABC News Video Source (an office within ABC News that licenses certain kinds of ABC News material) about licensing the hidden-camera footage used in the 20/20 broadcast at issue in this case. *See id.* at 20–21. Then, after receiving a response indicating that ABC "[did] not own the copyright," the plaintiff demanded that the defendants produce any e-mails relating to the 20/20 episode in the possession of ABC News Video Source. *See id.* Only later did it become clear that the plaintiff had the e-mail inquiry sent so that he could create evidence favorable to his case without any direct connection to the creation of the evidence. *See id.* at 21–22.

[26] The Court personally observed this envelope at a status conference held on February 25, 2011, although it did not attempt to ascertain the source of the envelope's soiling. *See* Tr. of Status Hearing at 17:17–19:11 (Feb. 25, 2011).

[27] At his February 25, 2011 deposition, the plaintiff arrived with his own video camera, despite the fact that the defendants had given notice that it would be a videotaped deposition, and the deposition was in fact videotaped by a professional videographer. *See* Slate Dep. at 134:2–135:4, 137:5–10. This required the Court to intervene in the deposition and instruct the plaintiff that he was not entitled to create a second videotape of the deposition. *See id.* at 136:10–139:21.

*See* Defs.' Bad-Faith Mem. at 20–23, 30, 33–35. Furthermore, the plaintiff appears to have abused the subpoena power and other elements of the judicial process on several occasions throughout discovery. Indeed, as a result of the plaintiff's conduct, both this Court and the magistrate judge assigned to oversee discovery in this case had to order the parties not to serve any further subpoenas pending the resolution of discovery-related motions. *See* Minute Order dated Feb. 25, 2011; Order with Respect to the Conduct of Discovery at 1, ECF No. 41. The examples of the plaintiff's behavior in this regard are more fully set forth in the defendants' brief, but the Court will discuss two illustrative examples.

First, the plaintiff subpoenaed the testimony of ABC News anchor Elizabeth Vargas, who, along with John Stossel, was the co-anchor of the allegedly infringing 20/20 broadcast. *See* Mem. in Supp. of Mot. for Protective Order at 1, ECF No. 62-1. Although Ms. Vargas technically participated in the allegedly infringing broadcast, the defendants maintained that "there is no evidence that she had anything to do with, or any knowledge of, how ABC News either acquired the footage at issue in this case, decided to use it, or indeed any aspect of the story's creation, production, editing or broadcast." *See id.* at 3 (citing Dec. of Elizabeth Vargas ¶ 3, ECF No. 62-2). The plaintiff never contested that Ms. Vargas had no relevant information to provide but continues to assert vaguely that Ms. Vargas "had as much knowledge of what was going on during the events at issue in this litigation as any number of people Defendants also

---

[28] As the defendants summarize in their briefing, this evidence included, most notably, "entirely blank VHS tapes, along with eight hours of programs recorded in the early 1990s on Philadelphia television stations when Slate would have been about eight years old." *See* Defs.' Bad-Faith Mem. at 33. It also included items such as "a manual for a pressure washer," "a manual for a Honda engine," and "1,600 pages of the same printout from LexisNexis." *See* Tr. of Status Hearing at 18:3–12 (Feb. 25, 2011). In light of this conduct, the Court was compelled to conduct a status hearing for the purpose of implementing procedures to ensure that the plaintiff could no longer abuse the discovery process. *See, e.g., id.* at 16:13–19:24, 27:14–28:09. The Court observed several examples of the plaintiff's irrelevant productions at that status hearing, which went unremarked by the plaintiff. Furthermore, due to the plaintiff's conduct, the magistrate judge assigned to oversee discovery in this case was required to instruct that "the parties shall serve only documents that are responsive to [discovery] requests" and "the parties shall refrain from including extraneous material with the responsive documents." *See* Order with Respect to the Conduct of Discovery at 2, ECF No. 41.

indicated they wished to depose but never did." *See* Pl.'s Bad-Faith Opp'n at 11. What is more, when the defendants sought to reschedule Ms. Vargas's deposition, the plaintiff threatened to hold Ms. Vargas in contempt. *See* Decl. of Chad Bowman ("Second Bowman Decl.") (May 31, 2011) Ex. 25, ECF No. 69-27 ("If Vargas does not appear at the noticed deposition I will seek sanctions and ask the Southern District of New York to hold her in contempt."). Despite this, the plaintiff never opposed the defendants' motion to quash the subpoena. *See* Defs.' Bad-Faith Mem. at 24. It thus appears to the Court that the only purpose for subpoenaing Ms. Vargas was to entangle a prominent journalist in this case, without any proffered good-faith basis to believe that she had any probative or material knowledge of the underlying facts.

Second, the plaintiff has used (and abused) judicial process to harass and discredit Kamau. As detailed in the defendants' brief, since the initiation of this litigation, the plaintiff has moved to hold Kamau in contempt, procured a bench warrant for Kamau's arrest, and served no fewer than five subpoenas on Kamau and Kamau's former employers. *See* Defs.' Bad-Faith Mem. at 26–28. This behavior crescendoed, reaching its apex at the deposition of Kamau, during which the plaintiff examined Kamau about the bench warrant for his arrest and had Kamau served with process twice. *See id.* at 28–29. One need look no further than the plaintiff's summary judgment opposition brief to understand that a major focus of his litigation efforts has been to cast a pallor on Kamau's credibility. *See* Pl.'s SJ Opp'n at 4–8 (beginning argument section with extended discussion of Kamau's credibility). As the defendants observe, "[t]he animus between the two at the deposition was palpable," but the Court agrees that "their disputes provide no excuse for Slate to manipulate judicial process and proceedings to try to influence the outcome of *this* case." *See* Defs.' Bad-Faith Mem. at 29 n.12 (emphasis in original).

The Court cannot be sure what motivated the plaintiff to engage in the unusual, and often times improper, behavior discussed above. What is pellucidly clear from the totality of the plaintiff's conduct, however, is the plaintiff's lack of respect for the federal judicial process. Litigating a case in federal court is a privilege that requires conformance with the rules, *see* FED. R. CIV. P. 1 (federal rules of procedure are "construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding"); FED. R. CIV. P. 11(b),[29] and it also requires the pursuit of litigation positions with the utmost good faith, even if those positions are self-interested or zealously advocated. Hence, there is simply no place in any court for the behavior that the plaintiff has engaged in throughout this litigation. In determining what type of sanction is appropriate to both punish and deter the plaintiff's conduct, the Court is mindful of the D.C. Circuit's admonition that "a district court may not rely on its inherent power to impose a sanction of either default or dismissal without explaining why lesser sanctions were likely to be ineffective." *See Shepherd*, 62 F.3d at 1479. Ultimately, as discussed below, the Court concludes that the only sanction that will be effective in this case is the very serious sanction of dismissal.

First, dismissal would be the only effective sanction for the plaintiff's course of conduct because "[t]o impose only a money sanction would be an open invitation to abuse of the judicial process." *See Young*, 217 F.R.D. at 70 (internal quotation marks omitted). Second, the fact that the plaintiff is proceeding *pro se* is a strong indication that he would be unwilling or unable to pay any monetary sanctions leveled against him, and of course he cannot be punished with a suspension or revocation of his license to practice because he has none. Thus, such sanctions are unlikely to be effective in adequately deterring and punishing the plaintiff's misconduct. *See,*

---

[29] The obligations of Rule 11(b) apply not only to attorneys but also to "unrepresented part[ies]" like the plaintiff in the instant action. *See* FED. R. CIV. P. 11(b).

*e.g.*, *id.* (observing that *pro se* party would likely be unable or unwilling to pay any fines or other monetary sanctions).[30]

      Third, merely excluding the fabricated evidence would not only fail to address the plaintiff's other misconduct, discussed above, but would also send the plaintiff, and future litigants like him, the message that "they have everything to gain, and nothing to lose," by continuing to submit fabricated evidence. *See Pope v. Fed. Express Corp.*, 138 F.R.D. 675, 683 (W.D. Mo. 1990), *partially vacated on other grounds*, 974 F.2d 982 (8th Cir. 1992); *see also id.* ("Litigants must know that the courts are not open to persons who would seek justice by fraudulent means."). Fourth, the nature of the particular document that was fabricated also militates in favor of sanctioning the plaintiff with dismissal, as opposed to a lesser kind of sanction. *See, e.g.*, *Young*, 217 F.R.D. at 70 ("Dismissal is particularly appropriate where a plaintiff seeks to enhance the merits of her case with fabricated evidence and fictionalized testimony."). As discussed above, the plaintiff has submitted this document as a critical piece of evidence—indeed the *only* evidence that the plaintiff ever put ABC on notice of his non-affiliation with the PCC and his expectation to be paid directly for his work, prior to his attempts to withdraw any license on March 14, 2008. For these reasons, the Court cannot conceive of any sanction short of dismissal that would adequately punish the serious and multifarious conduct of the plaintiff in this action and deter similar conduct by future litigants. Accordingly, the Court will grant the defendants' motion to dismiss for bad-faith litigation conduct.

---

[30] Additionally, although some of the plaintiff's conduct might possibly be blamed on his ignorance, as a *pro se* litigant, of the obligations of an officer of the court, his *pro se* status alone is not a reason to spare him from the sanction of dismissal. *See, e.g.*, *Handy v. Shaw, Bransford, Veilleux & Roth*, No. 00-2336, 2006 WL 3791387, at *8 (D.D.C. Dec. 22, 2006). This is particularly true in the instant case where it is clear that the *pro se* plaintiff has formal legal training, *see, e.g.*, Slate Dep. at 18:1–20, and he was given notice of the possibility of the sanction of dismissal and had a full opportunity to contest the grounds for that sanction.

## IV.     CONCLUSION

As discussed above, the Court first concludes that there is no genuine dispute of material fact regarding the ongoing and consistent representations that the plaintiff made to ABC News regarding his affiliation with the PCC.  As a result, the defendants are entitled to judgment as a matter of law on the basis of equitable estoppel because the defendants reasonably and detrimentally relied upon the plaintiff's representations.  Furthermore, the Court also grants the defendants' motion to dismiss this action as a sanction for the plaintiff's persistent course of bad-faith litigation conduct.

An appropriate Order accompanies this Memorandum Opinion.

Date: April 23, 2013

_/s/ Beryl A. Howell_____
BERYL A. HOWELL
United States District Judge